# NATIONAL SAFE DEPOSIT, SAVINGS, & TRUST COM-
## PANY *v.* HIBBS.

---

CUSTOM AND USAGE; CERTIFICATES OF STOCKS; TORTS; TROVER; BROKERS.

1. The general custom or usage existing in the District of Columbia whereby the holders of certificates of stock assigned in blank are regarded by bankers, brokers, and others dealing in stock certificates as the owner, for the purpose of selling and pledging such certificates, is one that rather follows the established law than sets up a new and independent rule governing such transactions.

2. While certificates of stock assigned in blank by the owner are not negotiable instruments in a strictly legal sense, they so approximate

them that the ordinary rules of agency and estoppel which apply to the case of chattels are applied to them with great liberality in behalf of bona fide purchasers for value.

3. The provision on a certificate of stock, that the shares it represents shall be transferable only on the books of the corporation by the registered owner or by his attorney upon the surrender of the certificate, is intended for the convenience and security of the corporation alone.

4. Where the named owner of a stock certificate executes a transfer thereof in blank, and delivers it to a broker or agent for certain limited purposes, and the broker or agent, in violation of his duty and obligation to the depositor, delivers it to another person without notice and for valuable consideration, the purchaser takes a good title; but where such a certfiicate has been stolen from the owner without culpable negligence on his part, an innocent purchaser from the thief or his assignee takes no title.

5. Where a loss has occurred through the wrongful act of a third person, and must be borne by one of two innocent persons, the one who by his negligence or inadvertence has placed it in the power of the third person to perpetrate the wrong must suffer the loss. (Following *Carusi* v. *Savary*, 6 App. D. C. 330; *Fifth Cong. Church* v. *Bright*, 28 App. D. C. 229; and *Central Nat. Bank* v. *National Metropolitan Bank*, 31 App. D. C. 391, 17 L.R.A.(N.S.) 520).

6. Where an employee of a trust company, one of whose duties is to deliver stock certificates deposited with the trust company by borrowers as collateral security for their loans, fraudulently procures such certificates, which had been assigned in blank by the owner, from an officer of the company on the false representation that the borrower desires to pay his loan, and sells them through a stockbroker, who believes him to be the owner thereof, and converts the proceeds to his own use, the title to the certificates passes to a bona fide purchaser for value from the broker,—especially where, by general usage and custom, possession of such certificate is recognized as evidence of ownership and authority to sell.

7. Where the sale through a stockbroker of certificates of stock assigned in blank and placed in his hands for sale, by an employee of a trust company who had fraudulently obtained possession of them from officers thereof, passes title to a bona fide purchaser for value, the broker will be afforded equal protection, and is not liable in trover to the trust company for the alleged conversion of the certificates.

No. 1921. Submitted December 3, 1908. Decided February 2, 1909.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia on an agreed statement of facts, trial by jury having been waived by the parties, in an action of trover for the alleged conversion of certificates of stock.                    *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an action to recover the value, alleged at $6,000, of certain shares of stock wrongfully taken from the National Safe Deposit, Savings, & Trust Company, plaintiff, and sold by the taker, through the agency of the defendant, William B. Hibbs.

A jury was waived, and the case submitted to the court upon an agreed statement of facts.

The material facts are the following:

The plaintiff trust company had been engaged for more than twenty years in a general banking business, and was accustomed to make loans to customers on notes secured by collateral consisting of stocks, bonds, and real estate. To a limited extent it bought and sold bonds and stocks for customers, and occasionally for itself.

Willard H. Myers was employed by plaintiff in 1882, and remained so employed until May 28, 1904. He was general bookkeeper and assistant note-teller. He had, prior to the act in question, committed no act inconsistent with his duties, and was trusted as a faithful employee. A part of Myers's duty during the last ten years of his employment was to make entries in the plaintiff's cash book, and act as note-teller in the absence of the note-teller; to receive from one of the plaintiff's officers collateral securities for the purpose of delivering the same to customers entitled thereto by payment of the loans secured thereby. He had no authority, and it was no part of his duty, to pledge, sell, or otherwise dispose of any stock, bonds, or other collateral pledged with the plaintiff to secure loans; or to sell, pledge, or otherwise dispose of any stocks, bonds, or other property of the plaintiff or its customers.

On March 12, 1903, one T. M. Kelley procured a loan from

plaintiff of $12,500, for which he gave his note to plaintiff due on demand.   To secure the note he deposited with plaintiff certain certificates of the Merganthaler Linotype Company, representing in all 100 shares of its capital stock.   One certificate, No. 1105, represented twenty shares; one, No. 669, represented ten shares.   Each certificate was in the name of T. M. Kelley, and recited that it was transferable only on the books of the corporation by the person in whose name it stood or by his attorney upon surrender of said certificate.   Each contained on its back a blank assignment and power of attorney to transfer said stock upon the books of the corporation.   These were signed by said Kelley, whose signature was duly attested.   "At that time, for many years previously, and thence hitherto, possession of stock certificates so assigned in blank and attested was, by the custom of banks, brokers, and others dealing therein, and which custom was known to the plaintiff, recognized and accepted, in the absence of knowledge or cause of suspicion to the contrary, as evidence of ownership or authority to sell, pledge, or otherwise deal therewith as an owner might do."[*]   On Thursday, May 26, 1904, Myers requested the secretary of the plaintiff to procure from the vault where were kept all of the collateral securities of the plaintiff, the said collateral, deposited by Kelley as aforesaid.   Similar requests had often, prior thereto, been made by Myers, it being usual in the ordinary course of the business for the plaintiff to deliver to Myers, upon his request, collateral securities for the purpose of delivery to the owner when ready to pay his loan.   The secretary was the brother-in-law of Myers. He, in compliance with the request, procured the collateral aforesaid (the whole 100 shares) and delivered the same to Myers for the purpose of having the same returned to Kelley.   It was part of Myers's duty to receive payment of notes, and enter such payments upon the cash book of the plaintiff.   Kelley was not in the bank at the time of the request, did not offer to pay his note, and did not ask for return of his collateral stock.   No entry was made of payment in the cash book, and nothing was done by

---

[*]Quotation from the agreed statement of facts.—Reporter.

said Kelley to form the basis of any entry. "On Friday, May 27th, Myers went to the office of the defendant, there saw the defendant's cashier, one W. T. Cox, delivered to said Cox said certificates of Merganthaler stock numbered 1105 and 669, above described, and stated that he wished defendant to sell said stock for him. Defendant was at that time engaged in the business of a stockbroker, with offices situated at No. 1419 F Street, Northwest, in the city of Washington, and was employing said Cox as his cashier in the conduct of said business. The said Myers at the time he delivered the said certificates numbered 1105 and 669 to the defendant for sale on his account, at the request of the said Cox, and in accordance with the usual custom in such cases, where the signature of the assignor and of the attesting witness are unknown to the broker, signed his own name to the attestation clause of the assignment or power of attorney indorsed on each of the said certificates of stock, as a further identification of the signatures of the said Kelley and of the original attesting witness, whose signatures were unknown to the said Cox. The defendant was out of the city at that time, and the said certificates were turned over to one George W. E. Slater, a stockbroker, to sell in the place of the defendant on the stock exchange in this city. The said two certificates of stock were thereupon sold on said day, certificate numbered 1105 being bought by one W. J. Flathers, and certificate numbered 669 by one Walter Heiston. Said stock was paid for by the purchasers on the last-mentioned day, to wit, Friday, May 27th, 1904, and said Myers was paid therefor by check of W. B. Hibbs & Company, the firm name under which said defendant was conducting his business, said check being drawn on the Riggs National Bank for the sum of $5,205, being the amount of the proceeds received from the sale of said certificates of stock. The market value of said stock was, on Friday, May 27th, 1904, $173.50 per share. At the time said Myers brought said stock to the office of the defendant to be sold by him, nothing was said by Myers to indicate that he did not own said stock, and neither did the defendant nor his cashier know, suspect, or have cause to suspect that the stock did not belong to him, said

Myers. Said Myers took the said check of W. B. Hibbs & Company and cashed it on Saturday, May 28th, 1904, at the Riggs National Bank. Said Myers did not represent to said Cox that he was selling said stock for the plaintiff, or that he was acting for plaintiff in any way, and he was in fact selling said stock, and the same was sold, without the knowledge or consent of the plaintiff, and without the knowledge or consent of the said T. M. Kelley. Of the remaining shares of the said stock, ten shares were in like manner sold for the said Myers by or through the defendants aforesaid, and the purchase money paid to the said Myers; fifty shares were hypothecated by the said Myers as security for a loan of $3,500 obtained by him from the American Security & Trust Company on the faith of the said security; and the remaining ten shares were subsequently recovered from the said Myers, being by him surrendered to the authorities."*

On the foregoing facts, the court entered judgment for the defendant Hibbs, and plaintiff has appealed therefrom.

*Mr. Charles L. Frailey* and *Mr. A. S. Worthington,* for the appellant:

1. Certificates of stock, such as those concerned in this controversy, are not negotiable instruments, and do not fall within the negotiable instrument laws, even when indorsed in blank by the owner thereof. *Hammond* v. *Hastings,* 134 U. S. 399–404; *Dewing* v. *Perdicaris,* 96 U. S. 196; *O'Herron* v. *Gray,* 168 Mass. 573; *East Birmingham Land Co.* v. *Dennis,* 85 Ala. 565, 2 L.R.A. 836; *Knox* v. *Eden Musée Co.* 148 N. Y. 441, 31 L.R.A. 779; Code of Laws D. C. sec. 1305.

2. No usage or custom can alter or affect a well-settled principle of law. Therefore no usage or custom of brokers tending to regard certificates of stock indorsed in blank as negotiable securities makes them such, or alters the principles of law applicable to them as non-negotiable instruments. *Thomas* v. *Riggs,* 5

---

*Quotation from the agreed statement of facts.—Reporter.

Wall. 663–680; *Barnard* v. *Kellogg,* 10 Wall. 383–391; *East Birmingham Land Co.* v. *Dennis,* 85 Ala. 565, *supra; Barstow* v. *Mining Co.* 64 Cal. 388.

3. A pledgee of certificates of stock has sufficient title thereto to maintain an action for damages for the conversion thereof. *Smith* v. *Maberry,* 61 Ark. 515–520; *Treadwell* v. *Davis,* 34 Cal. 601–606; *U. S. Express Co.* v. *Meintz,* 72 Ill. 293; *Adams* v. *O'Connor,* 100 Mass. 515–517.

4. The defendant, being the agent of Myers for the sale of the stock in controversy, is liable in damages for its conversion. A commissary's voucher was stolen and sold by an innocent third party for the thief. The court decided that the agent was liable in trover to the true owner for the value of the property sold. *Koch* v. *Branch,* 44 Mo. 542. Where certain goods were purloined and sent by the third party to auctioneers in Baltimore, who sold them without knowledge that their principal was not the lawful owner, it was held that the auctioneers were liable for conversion. The court in this case distinguishes the English decisions, and comments upon them. *Hoffman* v. *Carow,* 22 Wend. 285–290 *et seq.* The plaintiff was the owner of 100 shares of mining stock, the certificate representing it being indorsed in blank by the person to whom it was issued. This stock was stolen from the plaintiff by an employee in his office, who took the certificate to a stockbroker for sale. The employee represented himself as the owner of it, and the broker, relying upon his representation of ownership and in ignorance of the theft, sold the stock in the usual course of business, and paid over to the thief the proceeds of the sale. In an action against him for conversion the court held that he was liable. *Swim* v. *Wilson,* 90 Cal. 126, 13 L.R.A. 605–607. A certificate of stock was stolen and brought by the party who purloined it to a broker, who, innocent of the manner in which the stock had been acquired, sold the same, relying upon the representation of ownership by the thief. In an action for the value of the stock the broker was held liable. *Bercich* v. *Marye,* 9 Nev. 312. Government bonds payable to bearer were stolen and brought to a broker for sale. The broker, without knowledge of the theft

and assuming his customer was the true owner of the bonds, sold them for him. It was held that the broker, being the agent for the thief, although innocent of any wrongdoing on his part, was nevertheless liable to the plaintiff for the value of the bonds. See also *Coles* v. *Clark,* 3 Cush. 399; *Kearney* v. *Clutton,* 101 Mich. 106; *Fort* v. *Wells,* 14 Ind. App. 531.

5. There was no negligence in this case on the part of the plaintiff, and there were no circumstances tending to show want of care from which estoppel can arise as against the plaintiff. The wrongful act of Myers was the proximate cause of the defendant's conversion of the certificates of stock by the sale thereof. The school bonds of a certain county in Ohio were taken up by the treasurer of the county, D, who was directed to cancel them. Instead of so doing, D hypothecated the bonds to S to secure the latter for a loan to D. S was innocent of the deception. The county, of course, refused to pay the bonds, and S lost his money. The supreme court of Ohio held: (1) That the county was not negligent in failing to see that D carried out its directions and canceled the bonds, and that therefore (2) no estoppel arose; (3) that even if there was some negligence, it was not of such a character as to equal bad faith or fraud and thus come within the doctrine of estoppel; (4) that the loss of S was not the proximate result of negligence or any omission of duty. The direct and only cause of the loss was the crime committed; and in committing it D did not pretend to act as treasury, but for himself and his own advantage, and S so trusted him. *Board of Education* v. *Sinton,* 41 Ohio St. 504–513. See also *Hill* v. *Publishing Co.* (Mass.) 13 L.R.A. 193. A leading case directly in point is found in New York State,— a case later than *McNeil* v. *Tenth National Bank,* 46 N. Y. 325, relied upon by appellee, and referring to it as an authority in favor of the proposition here relied upon by the appellant. See also *Knox* v. *Eden Musée Americain Co.* 148 N. Y. 441, 31 L.R.A. 779–783–785. Certificates of stock were deposited in a bank for safekeeping by a guardian for certain minors. The stock was indorsed in blank in the name of the minor, "by O., Guardian." An officer of the bank embezzled them—*i. e.,*

took them and pledged them for his own benefit. One of the questions in the case was whether the guardian was negligent in leaving them in the bank for safekeeping thus indorsed. The court held no negligence, and that the act of the guardian was not the proximate cause of the defendant's (pledgee's) loss. *O'Herron* v. *Gray,* 168 Mass. 573, 577. Action for conversion. —Non-negotiable city bonds endorsed in blank were handed by the plaintiff to his broker to be put in the latter's safe for safekeeping only. The broker took the same feloniously from his safe, and pledged them. They were sold by pledgee to defendant, who had new bonds issued to him. Held, that plaintiff's title was not devested, and that he was not negligent. *Scollans* v. *Rollins,* 173 Mass. 275, 280–281. See also *Farmers' Bank* v. *Diebold Safe & Lock Co.* 66 Ohio St. 367, 58 L.R.A. 620.

6. Defendant (appellee) is liable even though the court should consider the circumstances under which Myers obtained the stock in controversy such as to vest a good title in a bona fide purchaser for value. In the case at bar, no recovery is sought as against a bona fide purchaser. The title of an innocent holder is not involved. If it were, the defense of such title on the ground of the negligence of the owner sufficient to raise an estoppel would be appropriate, though in this case, as we think we have shown, unavailing. But here we have to deal only with one who makes no claim to the stock, but was the agent of the wrongdoer and acted in no other capacity. The fact that he was without knowledge of the fraud does not relieve him of responsibility. He acted for one who committed the wrong and the step, when bona fides protected in a proper case, was not reached, if at all, until the property had passed beyond the control of the perpetrator of the wrong and his agents. The protecting innocence of a bona fide holder cannot be extended to the agent of a wrongdoer. *Kimball* v. *Billings,* 55 Me. 147, *supra; Strickland* v. *Magoun,* 104 N. Y. Supp. 425, affirmed by New York court of appeals without opinion, 83 N. E. 1132; *Swim* v. *Wilson,* 90 Cal. 126.

*Mr. J. J. Darlington* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

It appears from the agreed statement of facts, that the purchasers of the stock in question were known to the plaintiff, and presumably might have been joined in the action, which is against Hibbs, the innocent agent in whose hands the stock was placed by the wrongdoer for sale. Before considering the question of the liability of the agent, as such, we think it important to consider whether the title actually passed to the purchasers, as against the plaintiff. If it did, then the question arises whether the agent is liable for the conversion notwithstanding that fact.

It is well settled that certificates of stock are not negotiable instruments. At the same time, they are so constantly used as collateral and passed from hand to hand, when the blank transfer and power of attorney on their backs has been formally executed by the party to whom they were issued, that the general custom in the city of Washington, as we have seen, is to regard the holder as the owner for the purpose of selling or pledging them. As has been said by the Supreme Court of the United States, in the case of national bank stock, but in words equally applicable to the stock of all ordinary corporations:

"The power to transfer their stock is one of the most valuable franchises conferred by Congress on banking associations. Without this power, it can readily be seen the value of the stock would be greatly lessened, and, obviously, whatever contributes to make the shares of stock a safe mode of investment, and easily convertible, tends to enhance their value. It is no less the interest of the shareholder than the public, that the certificate representing his stock should be in a form to secure public confidence, for without this he could not negotiate it to any advantage. It is in obedience to this requirement, that stock certificates of all kinds have been constructed in a way to invite the confidence of business men, so that they have become the basis of commercial transactions in all the large cities of the country, and are sold in open market the same as other securities. Although neither

in form or character negotiable paper, they approximate to it as nearly as practicable.   If we assume that the certificates in question are not different from those in general use by corporations,—and the assumption is a safe one,—it is easy to see why investments of this character are sought after and relied upon. No better form could be adopted to assure the purchaser that he can buy with safety.   He is told, under the seal of the corporation, that the shareholder is entitled to so much stock, which can be transferred on the books of the corporation, in person or by attorney, when the certificates are surrendered, but not otherwise.   This is a notification to all persons interested to know, that whoever in good faith buys the stock, and produces to the corporation the certificates, regularly assigned, with power to transfer, is entitled to have the stock transferred to him. And the notification goes further, for it assures the holder that the corporation will not transfer the stock to anyone not in possession of the certificates." *First Nat. Bank* v. *Lanier,* 11 Wall. 369, 377, 20 L. ed. 172, 174; *Earle* v. *Carson,* 188 U. S. 42, 46, 47 L. ed. 373, 376, 23 Sup. Ct. Rep. 254.

This facility of commercial use, and its constant exercise, of such indorsed stocks by way of pledge and sale, accounts for the usage heretofore mentioned as general and well known to the plaintiff,—a usage that rather follows the established law than sets up a new and independent rule governing such transactions. Of course, usage cannot overturn a rule of law and create a new class of negotiable instruments unknown to the law.   "It simply fixes the meaning of an ambiguous expression, for the purpose of determining whether it is open to the former owner to deny that the property in the paper and the equitable benefit of the promise have passed to another." *Scollans* v. *E. H. Rollins & Sons,* 179 Mass. 346, 353, 88 Am. St. Rep. 386, 60 N. E. 983.   While, therefore, certificates of stock, indorsed as in this case, do not become negotiable instruments in a strictly legal sense, they nevertheless so approximate them as that the ordinary rules of agency and estoppel which apply in the case of chattels are applied to them with great liberality in the behalf of an innocent purchaser.   And notwithstanding the fact that transfers of

stock, to be perfect in every respect, may be required by the corporation charter to be registered upon the bonds of the corporation, the assignee of stock, upon delivery with transfer and power of attorney to transfer on the books, that has been formally executed by the party in whose name it stands, takes the entire equitable, if not the legal, title thereto. With some conflict of authority, it is the generally accepted doctrine that the requirement of transfer on the books of the corporation is intended for its convenience and security alone. Such is the rule in this jurisdiction. *Black* v. *Zacharie,* 3 How. 483, 513, 11 L. ed. 690, 704; *Johnston* v. *Laflin,* 103 U. S. 800, 804, 26 L. ed. 532, 534; *Cecil Nat. Bank* v. *Watsontown Bank,* 105 U. S. 217, 222, 26 L. ed. 1039, 1042; *Leyson* v. *Davis,* 170 U. S. 36, 40, 42 L. ed. 939, 941, 18 Sup. Ct. Rep. 500.

It is well-established law that where a named owner of a stock certificate executes a transfer thereof in blank, and delivers it to a broker or an agent for certain limited purposes, and that broker or agent, in violation of his duty and obligation to the depositor, delivers it to another person without notice and for a valuable consideration, the purchaser takes a good title. *McNeil* v. *Tenth Nat. Bank,* 46 N. Y. 325, 7 Am. Rep. 341; *Cowdrey* v. *Vandenburgh,* 101 U. S. 572, 575, 25 L. ed. 923, 925; *National Safe Deposit Sav. & T. Co.* v. *Gray,* 12 App. D. C. 276, 287; *Russell* v. *American Bell Teleph. Co.* 180 Mass. 467, 469, 62 N. E. 751; *Pennsylvania R. Co.'s Appeal,* 86 Pa. 80, 83; *Burton's Appeal,* 93 Pa. 214.

On the other hand, it is a general rule of law that where stock certificates, so indorsed, have been stolen from the owner, without culpable negligence on his part, an innocent purchaser from the thief, or his assignee, does not take the title. *East Birmingham Land Co.* v. *Dennis,* 85 Ala. 565, 568, 2 L.R.A. 836, 7 Am. St. Rep. 73, 5 So. 317, and cases there cited; *Farmers' Bank* v. *Diebold Safe & Lock Co.* 66 Ohio St. 367, 58 L.R.A. 620, 90 Am. St. Rep. 586, 64 N. E. 518; *O'Herron* v. *Gray,* 168 Mass. 573, 40 L.R.A. 498, 60 Am. St. Rep. 411, 47 N. E. 429; *Scollans* v. *E. H. Rollins & Sons,* 173 Mass. 275, 279, 73 Am. St. Rep. 284, 53 N. E. 863; *Knox* v. *Eden Musée Ameri-*

*cain Co.* 148 N. Y. 441, 456, 31 L.R.A. 779, 51 Am. St. Rep. 700, 42 N. E. 988.

It is also a general principle applicable in law as well as in equity, where no settled rule of law intervenes to prevent its operation in a particular case, that where a loss has occurred through the wrongful action of a third person, and must be borne by one of two innocent persons, the one who by his negligence or inadvertence has placed it in the power of the third person to perpetrate the wrong must suffer the consequences. *Lickbarrow* v. *Mason,* 2 T. R. 70; *Carusi* v. *Savary,* 6 App. D. C. 330, 344; *Fifth Cong. Church* v. *Bright,* 28 App. D. C. 229, 239; *Central Nat. Bank* v. *National Metropolitan Bank,* 31 App. D. C. 391, 17 L.R.A. (N.S.) 520.

In the light of the foregoing principles as applied to the agreed facts in this case, we come to the determination of the question whether the plaintiff can set up a title to the stock superior to that of the innocent purchaser.

This is not the plain case of certificates intrusted to an agent or creditor as security for a particular purpose, and fraudulently disposed of by him for another, under the general power enabling him so to do, so as to bring it directly within the principle illustrated by the case of *McNeil* v. *Tenth Nat. Bank, supra,* and other cases cited. Nor, on the other hand, is it a plain case of theft, without negligence of the owner and custodian, so as to bring it directly within the principle of *East Birmingham Land Co.* v. *Dennis, supra,* and cases cited therewith. On the whole, however, giving due allowance to the character and values of the paper, and the general usage of the business in relation thereto in which the trust company was engaged, also, we are of the opinion that the analogy in this case is with the former, rather than the latter. The importance of the question, the forcible argument on behalf of the appellant, and the well-considered cases on which he relies, render a review of the latter important, if not necessary. The case most strongly relied on, and which presents the greatest difficulty, is that of *Knox* v. *Eden Musée Americain Co.* 148 N. Y. 441, 31 L.R.A. 779, 51 Am. St. Rep. 700, 42 N. E. 988, decided by the same court that had decided *McNeil* v. *Tenth Nat. Bank.*

One Jurgens was a clerk and manager of the corporation. It was his duty, among other things, to cancel surrendered certificates of stock, paste them in the certificate book, prepare new ones, obtain the signature of the president, and impress the seal upon them before delivery to the proper person. In all previous cases the president had only signed new certificates when the canceled ones were exhibited to him, as pasted in the book. In the particular case, certificates for twenty-four shares belonged to a firm of which the president of the company was a member. The president, acting for his firm, agreed to sell them to one Diebrecht for $114 per share. He took the certificates indorsed in blank to the office, but, hearing that the purchaser was not then ready to pay, he left them in the office safe, to which Jurgens had a key, with direction to be canceled when paid for. About three weeks thereafter the payment was made, and the purchaser's check, with a new certificate which lacked only the president's signature, was sent by Jurgens to the president, to be signed by him. He accepted the check, signed the new certificate as president, and returned it to Jurgens. Jurgens did not cancel the old certificates and paste them in the book. They remained in the safe when the new certificates were issued and delivered. Later, Jurgens fraudulently took them from the safe and delivered them to Knox, who had no notice, as collateral security for a loan. The trial court held that the defendant was estopped to deny the ownership of Knox. That judgment was reversed. The court distinguished the case from *McNeil* v. *Tenth Nat. Bank,* holding that Jurgens was not the agent of the company for the purpose of issuing the surrendered certificates, and that the company had never placed them in his possession or invested him with the *indicia* of ownership; that he had access to the safe as a mere servant of the corporation, and committed a crime in taking possession of and using them. It was also held that the corporation was not guilty of negligence that would entitle Knox to recover. Without undertaking to approve or disapprove the decision on the facts presented, we think that those facts distinguish the case from the one in hand as readily as from that of *McNeil* v. *Tenth Nat. Bank.* While Jurgens was an officer

of the corporation and had access to its safe, the certificates were never delivered or intrusted to him for any purpose. As indicated in the opinion of the court, he committed a crime, apparently larceny, in taking them into his possession. It is to be remembered that a corporation can only act by agent. In the present case, Myers had no opportunity to take the certificates from the vaults, but he was the agent of the bank to receive them from another officer and return them to the owner upon the discharge of his debt. It was the custom of that officer to commit them to him for that purpose. His possession was fraudulently acquired, and while his act was probably not technically larceny, it amounted to embezzlement under the Code. Sec. 834, [31 Stat. at L. 1325, chap. 854]. Whatever it may be, technically, is not material in the disposition of this case. *Russell* v. *American Bell Teleph. Co.* 180 Mass. 467, 469, 62 N. E. 751. In that case it was said by Chief Justice Holmes: "In order to avoid the intimations of *Scollans* v. *E. H. Rollins & Sons,* 179 Mass. 346, 88 Am. St. Rep. 386, 60 N. E. 983, the plaintiff sets up that in this case only the possession of the certificate, not the property, passed to the agent and that, as the possession was obtained by fraud, it was obtained by larceny in judgment of law. In *Scollans* v. *E. H. Rollins & Sons,* it is admitted that the general principle there laid down would not apply to an instrument indorsed in blank and stolen before it had been transferred. We shall not examine the premises of this defense, because we cannot accept the conclusion. The qualification of the rule, as not applying when the instrument is stolen, is not based upon the name of the agent's crime, but upon the fact that in the ordinary and typical case of theft the owner has not intrusted the agent with the document, and therefore is not considered to have done enough to be estopped as against a purchaser in good faith. He certainly has not done enough if the estoppel is based upon the principle that, when one of two innocent persons is to suffer, the sufferer should be the one whose confidence put into the hands of the wrongdoer the means of doing the wrong. But in a case like the present the agent has been intrusted with the converted property, and it is totally immaterial whether, by a

stretch which extends larceny beyond the true field of trespass, his wrong has been brought within the criminal law or not. The ground of the estoppel is present, and the estoppel arises." In that case, the plaintiff's testatrix, a very old woman, had eight shares of stock of the company, and had notice of the intention of the company to increase its stock and of the right of holders to subscribe for the same in proportion to their present holdings. The broker, Gleason, called on testatrix, informed her of her right to the new stock, and offered to attend to the matter for her by surrendering her certificate and obtaining a new one including the additional stock. At his request she signed the blank transfer and delivered the certificate to him. The broker had no intention of getting the new stock for her; his purpose was to obtain the certificate and effect a loan upon it for his own use. He presented it to a trust company, representing it to be his stock, and obtained a loan upon it. Plaintiff was held to be estopped by her conduct, notwithstanding the possession of the certificate was obtained by fraud and its conversion amounted to a criminal act. That case and this are quite analogous, for in both the delivery to the agent was obtained through fraudulent representations and for a very different purpose from that avowed.

In *O'Herron* v. *Gray*, 168 Mass. 573, 40 L.R.A. 498, 60 Am. St. Rep. 411, 47 N. E. 429, the stock belonged to a minor and was indorsed in blank by her guardian. It was taken from the deposit vault by an officer having access thereto, and pledged for a loan. It was stolen, and, moreover, the purchaser was clearly chargeable with inquiry into the right of the guardian to transfer.

In *Scollans* v. *E. H. Rollins & Sons*, 173 Mass. 275, 279, 73 Am. St. Rep. 284, 53 N. E. 863, the registered bonds, with blank assignment upon them, were left with a broker firm for safe keeping merely. One of the firm took the bonds from the safe and sold them to a purchaser, who relied on the blank transfer. It was held that the title did not pass. Referring to the transfers executed in blank, the court said: "Where they do not purport in terms to confer ownership upon the bearer, the most which can be predicated of them, in the absence of evidence

of custom or usage, is that they are made in aid of the true title, .and not to defeat it, and that they are to be used only to help the true owner in procuring for himself the right,    *    *    * of which the documents so indorsed are the evidence." There was no proof of a usage that would rebut the presumption stated, as there has been in this case. On a second trial of the case, proof of such usage was made. The majority of the court held, however, that there was no evidence of any delivery of the bonds to the broker. They were sealed in an envelope, and the envelope intrusted to them for safe keeping. This was not intrusting the bonds themselves; the court saying: "The modern decisions have followed the ancient suggestion that in such case there is no delivery of the contents of the inclosure." In view of the fact that the certificates themselves were actually delivered to the wrongdoer in this case, and of the proof of usage in respect of certificates indorsed in blank, the following additional extract from that opinion is pertinent: "A blank indorsement of such an instrument signifies that some person is expected to have the right to fill in the blank. On its face it does not indicate who that person is. By itself it is ambiguous. If, however, the general understanding of all concerned gives it a certain meaning, then it has that meaning by the same convention that gives a certain meaning to spoken or written words. The combination of words and blank is a sign as truly as a completed sentence,—a sign which conveys an idea as definitely as if the word 'bearer' had been written in. The extent to which the owner shall be estopped by permitting the sign to remain upon the instrument in that form may be enlarged or limited by considerations of policy more or less articulate. No doubt, if such an instrument were stolen from the owner and indorser, before his indorsement had become effective by a transfer, or before the instrument had been put into other hands, even a bona fide purchaser would not get a title, and a different rule would be applied from that which is established in the interest of the currency with regard to bank notes used as money, and which might be extended to other bills and notes which are negotiable in the true sense. [Citing *Knox* v. *Eden Musée*

*Americain Co.* and other cases.] But if the owner of the instrument intrusts it to another, he does so charged with notice of the power to deceive which he is putting into that other's hands, and if deception follows he must bear the burden. [Citing *McNeil* v. *Tenth Nat. Bank,* and other cases.] In this case, as in some others, it cannot be said that the owner is free from all obligation to comtemplate the possibility of wrongdoing by a third person." *Scollans* v. *E. H. Rollins & Sons,* 179 Mass. 346, 352, 88 Am. St. Rep. 386, 60 N. E. 983. The extent to which this doctrine has been carried by a later decision of the same court. has been noted heretofore. *Russell* v. *American Bell Teleph. Co.* 180 Mass. 467, 469, 62 N. E. 751.

In *Board of Education* v. *Sinton,* 41 Ohio St. 504, the board of education for a certain school district were authorized to issue $20,000 of bonds, and no more. September 1, 1869, they issued 200 bonds of $100 each, payable September 1, 1879, to bearer. Their payment in advance of maturity was contemplated out of taxes levied for the purpose from year to year. Thirty of these bonds were redeemed before June, 1875, by the treasurer, on whose report the board ordered them to be canceled by defacing the signatures. The treasurer was one of the board, consisting of three members, and signed the bonds with the other two. He failed to cancel the bonds and subsequently took them to Sinton and deposited them with him as collateral security for money borrowed. Sinton had no previous acquaintance with the treasurer, and made no inquiry as to the custody or title to the bonds. The court denied his recovery, holding: 1. That the board had exhausted its power, and was not vested with authority to reissue bonds redeemed before maturity, as a private person or corporation would be. 2. There could be no estoppel by the act of public officers; but, assuming that there could be, there was no act of gross negligence by the remaining members of the board in leaving the matter of cancelation to the treasurer. 3. Sinton was not an innocent purchaser, as the bonds bore the signature of the treasurer, who might, therefore, well have had possession without any right of disposition. Under these circumstances it was the duty of Sinton to make inquiry. The distinction between that case and this is apparent.

The last case relied on by the appellant in support of his contention is that of *Farmers' Bank* v. *Diebold Safe & Lock Co.* 66 Ohio St. 367, 58 L.R.A. 620, 90 Am. St. Rep. 586, 64 N. E. 518. Tyler was secretary and treasurer of the Diebold Company, and owned a certificate for certain shares of stock in the same. Being indebted to the corporation, he signed a blank transfer of the certificate, and delivered it to the president thereof as collateral security. The president put it in an envelope, and laid it away in a drawer of the safe, used by the president for keeping papers of the corporation, over which he had personal control. Tyler had access to the safe, where other papers of the corporation were kept also. At the same time, the stub of the stock certificate book was marked: "Left with the company as collateral security," and dated August 20, 1889. June 1, 1891, Tyler not having paid his debt, the certificate was to be transferred to the president, Clark. The certificate could not be found in the safe, and a new certificate was issued to Tyler, who immediately assigned it to Clark. An entry was made on the certificate stub as follows: "Certificate lost and duplicate issued under 140, June 1, 1891." Clark did not have the new certificate transferred on the books of the company until June 23, 1892, at which time he surrendered it and obtained a new one in his own name. It was found, as a matter of fact, that the old certificate had been lost or mislaid without any negligence on the part of Clark, the president. Sometime thereafter Tyler found the old certificate in the envelope, under some other papers in the safe, and on April 29, 1895, deposited it with the bank as collateral security for a loan of $2,500. Neither the Diebold Company nor Clark had any interest in this loan, or knowledge of the same. Tyler was not acting as their agent, but for himself alone. The court held that the plaintiff could not recover against the Diebold Company. It said that the taking of the certificate by Tyler was, "in fact, a criminal act, perpetrated for private gain, and not connected with any official authority, real or apparent;" that "Tyler's access to the drawer where the certificate had been placed by Clark, and opportunity to possess himself of any of its

contents, was not, therefore, by reason of any authority." As to the question of estoppel, it was further said that there was no negligence on the part of the corporation or of Clark to warrant it. The facts of the case make it analogous to that of *Scollans* v. *E. H. Rollins & Sons,* that has been heretofore reviewed. It is different from the case in hand, because here the employee of the corporation did not secretly take the paper from the safe of the corporation, but received it from the hands of the custodian, by means of a false statement of his object.

Whilst not to be understood as intimating that a corporation or any other person is liable in all cases for the default of an agent or servant whose previous conduct has been such as to warrant the confidence reposed in him, we are of the opinion, in the absence of controlling authority to the contrary, that where the servant has been intrusted, as in this case, with a paper so indorsed as to enable him readily, and without exciting suspicion, to impose upon others as the true owner, notwithstanding the fraudulent representations through which he may have obtained that possession, the loss, as between two innocent persons, ought to fall upon the one whose act was the proximate cause of the loss. We see no reason why that principle should not apply in favor of the innocent purchaser in this case.

Upon the conclusion that the transaction passed the title to the shares to the innocent purchaser, it remains to inquire whether the equally innocent negotiator of the sale is nevertheless liable as the agent of the wrongdoer. The contention is that "the protecting innocence of a bona fide holder cannot be extended to the agent of the wrongdoer." The following decisions are cited in support of this contention. *Hoffman* v. *Carow,* 22 Wend. 285, 292; *Koch* v. *Branch,* 44 Mo. 542, 546, 100 Am. Dec. 324; *Coles* v. *Clark,* 3 Cush. 399; *Bercich* v. *Marye,* 9 Nev. 312, 316; *Kearney* v. *Clutton,* 101 Mich. 106, 45 Am. St. Rep. 394, 59 N. W. 419; *Swim* v. *Wilson,* 90 Cal. 126, 128, 13 L.R.A. 605, 25 Am. St. Rep. 110, 27 Pac. 33; *Kimball* v. *Billings,* 55 Me. 147, 151, 92 Am. Dec. 581.

In all of those cases, save one, the facts are such as to show that the purchaser took no title by the purchase. In *Hoffman* v.

*Carow,* the earliest of the cases, an auctioneer who sold stolen goods for the thief was held liable for their conversion; but it was said in the opinion of the chancellor, upon which the court of errors acted, that if the goods had been acquired by fraud, and not theft or felony, the title of the purchaser would be good. In *Koch* v. *Branch* a stolen voucher, without any element of negotiability, was collected by an innocent agent and the proceeds remitted to his principal. In *Coles* v. *Clark* a mortgage upon the goods had been recorded, but the goods remained in the possession of the mortgagor, who had them sold at auction. The auctioneer, though not in fact aware of the mortgage, was held liable. In *Bercich* v. *Marye* the innocent broker who sold stock for the thief was held liable. It does not appear that it had been transferred on the back. In *Kearney* v. *Clutton* goods had been wrongfully seized and sold at auction. The auctioneer was held liable for conversion. In *Swim* v. *Wilson* indorsed stock had been stolen and sold by a broker for the thief, who believed him to be the owner. It was said: "It is clear that the defendant's principal did not, by stealing plaintiff's property, acquire any legal right to sell it, and it is equally clear that the defendant, acting for him and as his agent, did not have any greater right, and his act was therefore wholly unauthorized, and in law was a conversion of plaintiff's property."

It will be observed that in no one of those cases would the purchaser have been exempt from liability had he been joined in the action for conversion. They are all founded in the settled rule of public policy that no title to chattels can be acquired through theft, or wrongful taking. Hence all persons, from the first to the last, who take an active or material part in dealing with the goods, are held liable for the goods or their value. Innocence of agent or purchaser is no protection to either. If it were otherwise, theft and wrongful taking of property would be encouraged. The exceptional case mentioned is that of *Kimball* v. *Billings,* supra. In that case, bonds payable to bearer, and presumably negotiable instruments, were stolen. An innocent agent who sold them for the thief was held liable for conversion. Under such conditions the innocent purchaser took an indefeasible

title. The only decision cited in support of the position of the court is that of *Coles* v. *Clark,* supra, which, as we have seen, is founded on a wholly different state of facts. In another case in which the facts are similar the supreme judicial court of Massachusetts reached a different conclusion. *Spooner* v. *Holmes,* 102 Mass. 503, 507, 3 Am. Rep. 491.

The same rule of exemption of the innocent agent has been employed in Maryland, in a case where one, having purchased goods with the intention to defraud the vendor, had them sold at auction and received the money from the auctioneer, who had no knowledge of the fraud. The vendor had parted with his title through fraud practised upon him, and was entitled to rescind the sale. *Higgins* v. *Lodge,* 68 Md. 229, 236, 6 Am. St. Rep. 437, 11 Atl. 846. Under that sale, the title would, of course, pass to an innocent purchaser.

If the innocent purchaser, under the special circumstances of this case, would be protected in the title acquired from the agent, we perceive no good reason why the equally innocent agent who, in good faith and in the ordinary exercise of his business, effected the sale, should not be protected also. The fraudulent holder of the paper produced the same indorsed in such manner as to raise the usual and reasonable presumption of actual ownership. The broker, in good faith, acted upon the presumption and procured a purchaser, who, acting upon the same presumption, purchased and paid for it. If the purchaser is to be exempted from liability, then it seems reasonable and just that the broker should be also.

For the reasons given, the judgment will be affirmed, with costs.                                      *Affirmed.*